**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**George M. KHOURY, Howard Kluver,
David W. West, Louis H. Chippas,
Defendants–Appellants.**

No. 86–5175.

United States Court of Appeals,
Eleventh Circuit.

May 21, 1990.

As Amended June 7, 1990.

Michael E. Gelety, Ft. Lauderdale, Fla. (Court-appointed), for Kluver.

Leonard J. Cooperman, Ferguson & Ferguson, Miami, Fla. (Court-appointed), for Chippas.

Bonnie Phillips Del Corral, Coconut Grove, Fla. (Court-appointed), for West.

George M. Khoury, Eglin Air Force Base, Fla., pro se.

Dexter W. Lehtinen, U.S. Atty., Linda Collins–Hertz, Dawn Bowen, Asst. U.S. Attys., Miami, Fla., for the U.S.

Before FAY and KRAVITCH, Circuit Judges, and THOMPSON *, District Judge.

KRAVITCH, Circuit Judge:

## INTRODUCTION

Various drug-related conspiracy, aiding and abetting, and Travel Act offenses are involved in this multi-defendant methaqualone importation case. Appellants raise a multitude of claims, some with merit, some without: the jury voir dire, sufficiency of

---

* Honorable Myron H. Thompson, U.S. District Judge for the Middle District of Alabama, sitting by designation.

the evidence, variance between indictment and proof, coconspirator hearsay, severance, an inventory search, the competence of a government witness, a witness' invocation of his fifth amendment right to remain silent, ineffective assistance of counsel, an alleged *Brady* violation, and the Speedy Trial Act. The government raises the propriety of special parole sentences given by the district court.

## BACKGROUND

Joseph Vershish had some experience with the importation business, having imported coupons to Haiti during the 1980s with the assistance of Serge Alexis, a Haitian lawyer. In July 1987, Vershish initiated a venture to import methaqualone powder from Hong Kong to Haiti via Canada, thus avoiding the violation of any United States drug laws. In Haiti, the powder was to be mixed by machine and pressed into pills. Vershish enlisted the aid of Joseph Candella, an electrician who invested $6,000 to fund Vershish's trip to Hong Kong. Candella was to modify the motors on the machinery so that the machines could run on Haitian electrical current.

Vershish traveled to Hong Kong and arranged delivery to Canada by cargo freight a shipment of methaqualone, in green barrels clearly marked methaqualone. While awaiting the arrival of the methaqualone, in September 1981 Vershish contacted Bob Armstrong, a pilot, and presented documents reflecting that Serge Alexis' company had a contract to pay for a seventy-five hour flight. The same month, Vershish and Candella examined some chemical mixing machinery in Florida.

During the following months, David West and his brother-in-law Louis Chippas traveled throughout New England, investigating warehouse space, with West occasionally using an alias and representing himself as working for a novelty item manufacturing concern. Vershish, Candella, West, and Chippas met with Ray (last name unknown), who Vershish said was the chemist who, assisted by George Khoury, would make the pills. The equipment was subsequently moved to another storage lo-

cation in New England, after being inspected by Ray. There were various meetings between West, Chippas, Khoury, and Vershish during this time, documented by hotel and travel receipts and Candella's testimony. Meanwhile, storage charges were accruing on the methaqualone barrels in bonded storage in Halifax, Canada, and AirCanada contacted Howard Kluver in an attempt to reach Alexis. Kluver denied any knowledge of the goods in storage.

The plan now, according to Vershish, was to load the methaqualone into the plane in Canada, offload the powder in Maine, reload empty boxes into the plane, and deliver the empty boxes to Haiti as a ruse to cover the importation into the United States. Candella, Chippas, and West scouted the Maine airstrip, and Armstrong, an experienced drug smuggler, agreed to make the flight for $250,000. There was police surveillance in Maine and Canada, however, and as a result the importation attempt was abandoned. There was also concern that a "bug" had been planted in the methaqualone barrels.

Armstrong testified he met with Alexis and Kluver in Ft. Lauderdale in November 1982 to discuss the failure of the Canada importation. According to Armstrong, Kluver said he had a methaqualone connection in China, and Alexis said he could arrange for financing.

In December 1982, Armstrong was arrested and became a government informant, taping subsequent conversations with Alexis, who wanted to reorganize the methaqualone importation from Canada, or to bring in another shipment. DEA agent Simpkins, posing as a buyer, brought up reactivating the Canada transaction, but Alexis nixed the idea because there was too much "heat." Alexis said he would speak to Kluver who had expertise and was trustworthy.

In March 1984, the indictment came down charging Chippas, West, Khoury, Kluver, Alexis, Vershish, and Williams with various narcotics offenses. All seven defendants were charged in counts one, two, three, and four with: conspiracy to import methaqualone into the United

States, in violation of 21 U.S.C. § 963; conspiracy to possess methaqualone with intent to distribute, in violation of 21 U.S.C. § 846; conspiracy to create a counterfeit controlled substance, that is, methaqualone tablets manufactured to resemble pharmaceutical quaaludes, in violation of 21 U.S.C. § 846; and aiding and abetting the attempted importation of methaqualone, in violation of 21 U.S.C. § 963 and 18 U.S.C. § 2. The defendants were also charged in various counts with violations of the Travel Act, in violation of 18 U.S.C. §§ 1952 and 2.

At trial the thrust of the defense case was that there was a legitimate plan to import methaqualone into Haiti without violating United States law. Several defendants contended they were innocent dupes who thought they were assisting a legitimate enterprise. The jury, however, believed the government's evidence.

Vershish was convicted on all counts with which he was charged. West was convicted on the first four counts and three Travel Act violations, but was acquitted on the fourth Travel Act violation charged. Khoury and Chippas were also convicted on the first four counts. In addition, Chippas received a guilty verdict on three Travel Act violations while Khoury was found guilty of one Travel Act violation. Kluver was convicted on the three conspiracy counts, but acquitted of aiding and abetting.

Neither Alexis, Williams, nor Vershish is an appellant: Williams was a fugitive at the time of trial; Alexis entered a guilty plea; Vershish dismissed his appeal.

## DISCUSSION

### I. THE JURY VOIR DIRE

Khoury and Kluver both allege that they were denied their right to a fair and impartial jury. During voir dire of the panel, one juror said that her son had been charged with a crime and murdered in a drug-related incident. The juror subsequently began to cry in the presence of the rest of the panel, and defense counsel moved to strike the entire panel because of the prejudicial impact of her statements. The court, although striking the juror for cause, refused to strike the entire panel, and instructed the remaining jurors that the statements made during voir dire were not evidence and had "nothing to do with the case.... Anything that is said by anyone here should not in any way affect you or if it does, it's only to all of the parties, the lawyers in the room [sic], that you make it known to us immediately and you should not let anything affect you."

Whether or not to strike a single juror or the entire panel "for cause" is committed to the discretion of the district court. The party challenging the refusal "must demonstrate that the juror in question exhibited actual bias: That is, either an express admission of bias, or proof of specific facts showing such a close connection to the circumstances of the case that bias must be presumed." *Ward v. United States*, 694 F.2d 654, 665 (11th Cir.1983). The defendants made no such showing in this case. *United States v. Tegzes*, 715 F.2d 505 (11th Cir.1983) supports the district court's refusal to strike the panel. In *Tegzes*, a juror, in the presence of the panel, stated that her youngest son had "OD"ed before his eighteenth birthday. She was stricken for cause, and the district court refused defense motions to strike the entire panel. This court approved the district court's actions, noting that a comment such as the one at issue

> did not constitute an opinion concerning the guilt or innocence of the defendants, nor did it relate to knowledge about the facts, parties, or witness involved.... Appellants' suggestion that mere awareness of the adverse consequences of crime induces bias toward the defendant is highly speculative and falls far short of the potential actual prejudice which would mandate additional voir dire.

715 F.2d at 508.

The jurors in this case took their oath, and absent evidence to the contrary, we must presume that they were fair and impartial, as indeed they swore to be.[1] The

---

1. Kluver also says that the jury was tainted by contact between a juror and a friend of one of

defendants had a fair and impartial jury as required by the constitution.

## II. VARIANCE

Khoury and Kluver contend that there was a material variance between the conspiracies alleged in counts one and two and the proof at trial.[2] Count one alleged a conspiracy to import methaqualone beginning in July 1981 and continuing until March 1984; count two alleged a conspiracy to possess methaqualone with intent to distribute beginning prior to July 1, 1981 and continuing until March 1984. Each of these conspiracies was alleged to be between the same coconspirators: Chippas, Alexis, Vershish, Kluver, Khoury, West, and Williams.

Khoury and Kluver contend that as to each of the counts, the government's proof showed that there were actually two conspiracies rather than one, that the first conspiracy ended when the first Halifax scheme terminated, and that the subsequent scheme to import a second load of methaqualone from China constituted a separate conspiracy, and that each of the three counts suffers from a fatal variance. Appellants argue that such a variance violates the rule enunciated in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

The government contends that there was no variance, but if there was, there was no resulting prejudice.

■ Our analysis is straightforward, derived from clear and unambiguous precedent. Initially, we must decide whether or not there was a material variance, and, if so, whether or not the defendant was prejudiced. *United States v. Caporale*, 806 F.2d 1487 (11th Cir.1986), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763

(1987). The question of whether the evidence proved single or multiple conspiracies is for the jury to determine in the first instance, and that determination will not be disturbed on appeal unless there is insufficient evidence from which the jury could have determined the existence of the conspiracy alleged in the indictment. *United States v. Brito*, 721 F.2d 743, 747 (11th Cir.1983).

■ The jury convicted on the conspiracy counts alleged in the indictment, and those convictions are implicit findings that the evidence proved the existence of the single conspiracy alleged. The jury was instructed that if it found that a conspiracy other than the one alleged in the indictment was proved, then the jury should acquit.[3]

■ In determining whether the evidence supported the existence of one conspiracy the factors we examine are: whether there was a common goal; the nature of the scheme; and the overlap of participants. In this case, there was indisputably a common goal, the importation of methaqualone into the United States, to be distributed in tablet form. The nature of the scheme remained the same as well: methaqualone would be shipped from China to a transshipping destination, either Hong Kong, Canada, or Haiti, and would then be smuggled into the United States, with air infiltration being the preferred method. Finally, we look to the overlap of participants. In *United States v. Stitzer*, 785 F.2d 1506, 1518 (11th Cir.), *cert. denied*, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 44 (1986), one distributor provided the common link between five separate "cluster" conspiracies, and the court considered the evidence sufficient to support a finding of one conspiracy; in *United States v. Cole*,

the defendants. We find the contention meritless. The contact was minimal and irrelevant to the case. The trial judge properly interviewed each of the jurors individually and was assured that each juror would be fair and impartial.

**2.** Given our disposition of count three, see *infra* section IV.D, we need not consider it here.

**3.** The jury was given a verdict form as to the conspiracy counts which provided for a re-

sponse of guilty or not guilty as to each count. Kluver complains that he was prejudiced as the verdict form did not provide the jury with a means for expressing a verdict where Kluver was guilty of one conspiracy but not the other. The jury was able to express such a conclusion: it could have found, and was instructed to find, the defendant not guilty if it found he was not a part of the conspiracy alleged in the indictment.

755 F.2d 748 (11th Cir.1985) there were two common participants and one common supplier of marijuana. Our disposition of the instant case is controlled by these precedents. Here, taking the evidence in the light most favorable to the government, the two conspiracies had common participants of at least Alexis and Armstrong. We conclude that there was sufficient evidence from which a reasonable juror could have concluded that the one conspiracy alleged in the indictment was proved.

## III. THE INVENTORY SEARCH AND BEYOND

■ Kluver argues that the district court erred in denying his motion to suppress evidence obtained by the government during a search of the contents of Kluver's car. When Kluver was arrested, his car was seized by the DEA for forfeiture. The car was impounded, and DEA Agent Simpkins inventoried the contents of the car. Simpkins testified that the purpose of such an inventory search was

> to insure that if there are valuable items or items preferably of value to the Defendant that he or she might construe to be of value that they are taken into custody, itemized or inventories [sic] so that there is no allegation at some point later on that they were misplaced or they were in the vehicle when they weren't in the vehicle. It could be money, it could be jewelry, it could be something as simple as sunglasses.

Agent Simpkins testified that such a search was "routine and required" although he did not identify the source of the routine or requirement.

From the locked car trunk, Simpkins removed a closed briefcase, took it to his office and inspected its contents, including a spiral notebook bearing a handwritten legend on its cover: "Kluver 10-1-82." Simpkins said that he looked through the notebook to identify any items of value that might have been concealed within its pages. He explained that he could not simply shake the notebook, expecting anything of value to fall out, because the notebook contained paper clips and he did not want to disturb them.

The government leadingly asked Simpkins on re-direct if he had "read [the notebook] page by page carefully at first." Simpkins candidly replied that he had not, but rather "looked through it just very cursory and thumbed through it. It was obvious it was a diary of some sort." At that point Simpkins had determined that the notebook was of value to Kluver. The government then asked if Simpkins "had formed an opinion whether or not that notebook had evidentiary value in connection with this case" after he had "flipped through" the notebook. "No," he replied, "no initially, no." He then stated he "retained custody of the notebook because in reviewing it subsequent to [his] initial perusal [he] determined that it may [sic] well be of evidentiary value or could be."

The record shows that Simpkins had served the purposes of the inventory by thumbing through the notebook, permitting him to ascertain that nothing of value was secreted between the pages while also determining that the notebook was of value to Kluver. That inspection did not, however, alert Simpkins to the evidentiary value of the notebook. Only "subsequent to [his] initial perusal" did he decide the notebook might have an evidentiary value.

The narrow issue presented is whether the subsequent inspection of the notebook violated the fourth amendment.

In *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), the Supreme Court noted that the reasonableness of an inventory search is not measured by the standards imposed in warrantless investigatory searches, at least in the absence of any allegation that the inventory search was a pretext for investigation. 479 U.S. at 371–72, 107 S.Ct. at 741. The Court identified the process as one by which a court must weigh the individual's fourth amendment interests against the legitimate governmental interest in protecting officers from danger and claims of malfeasance. 479 U.S. at 372–73, 107 S.Ct. at 742. We note that in the instant case, the DEA did not rely on danger to the investigators

as a rationale for the search, but justified the inventory search of the notebook on the grounds of protecting the individual's property and protecting the investigators from allegations of misconduct.

In *Bertine*, the Court also emphasized that its decisions "have always adhered to the requirement that inventories be conducted according to *standardized criteria.*" 479 U.S. at 373, 107 S.Ct. at 742 n. 6 (emphasis supplied) (citations omitted).[4] The use of standardized procedures tends to "ensure that the intrusion [is] limited in scope to the extent necessary to carry out the caretaking function." *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000 (1976); *see Illinois v. Lafayette,* 462 U.S. 640, 646–49, 103 S.Ct. 2605, 2609–11, 77 L.Ed.2d 65 (1983). Affirming the suppression of evidence seized by police claiming an inventory search justification, the Supreme Court recently declared that: "The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime....'" *Florida v. Wells,* — U.S. —, —, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1, 6 (1990) (citation omitted).

Conspicuously absent from the testimony at the suppression hearing is any evidence concerning the standardized procedures limiting the discretion of the investigating officers. The prosecution assures itself a smoother and surer path when it provides concrete evidence that the inventory search followed a standardized procedure pursu-

ant to regulatory strictures. *Cf. Wells,* — U.S. at —, 110 S.Ct. at 1635 (affirming suppression of evidence seized from closed container in absence of inventory policy concerning such containers); *Bertine,* 479 U.S. at 368 n. 1, 107 S.Ct. at 739 n. 1 (municipal code governing inventory searches); *United States v. Wanless,* 882 F.2d 1459, 1463 (9th Cir.1989) (inventory pursuant to regulations printed in Washington State Trooper's Manual); *United States v. Johnson,* 815 F.2d 309, 314 n. 6 (5th Cir.1987) (scope of inventory regulated by "standardized procedure outlined in a secret service manual"), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988). Nonetheless, in this case, Simpkins' testimony was uncontroverted that the inventory search was routine and required, that is, the search was performed as a matter of course when a vehicle was impounded and the investigating officer was not at liberty to decline to inventory the contents. The appellant does not suggest that the initial inventory search was anomalous or discretionary, and although we are concerned by the paucity of the record as to the standardized procedures, that issue was not raised and we need not decide it.

■■■■■ An inventory search is not a surrogate for investigation, and the scope of an inventory search may not exceed that necessary to accomplish the ends of the inventory. *United States v. Laing,* 708 F.2d 1568, 1570 (11th Cir.) (per curiam), *cert. denied,* 464 U.S. 896, 104 S.Ct. 246, 78 L.Ed.2d 235 (1983); *United States v. Prescott,* 599 F.2d 103, 105 (5th Cir.1979)[5] ("Inventory searches must be limited to effec-

---

**4.** We note that the importance of standardized procedures spurred three justices, out of a seven justice majority, to pen a separate concurrence in *Bertine.* Justice Blackmun, joined by Justices Powell and O'Connor, wrote in order

> to underscore the importance of having such inventories conducted *only* pursuant to standardized police procedures. The underlying rationale for allowing an inventory exception to the Fourth Amendment warrant rule is that police officers are not vested with discretion to determine the scope of the inventory search. This absence of discretion ensures that inventory searches will not be used as a

> purposeful and general means of discovering evidence of crime. Thus, it is permissible for police officers to open closed containers in an inventory search only if they are following standard police procedures that mandate the opening of such containers in every impounded vehicle.

479 U.S. at 376–77, 107 S.Ct. at 744 (concurrence).

**5.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

tuation of the recognized purposes for which they are conducted and they may not be used as a pretext for intrusive investigatory searches that would otherwise be impermissible."); *United States v. Edwards*, 577 F.2d 883, 893 (5th Cir.), *cert. denied*, 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978); *United States v. Gravitt*, 484 F.2d 375, 380–81 (5th Cir.1973) (inventory search intrusion should be "tailored to the specific public interests which lie at the root of the finding that the intrusions are reasonable"), *cert. denied*, 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 761 (1974);[6] *cf. Wells*, — U.S. at ——, 110 S.Ct. at 1635 ("policy or practice governing inventory searches should be designed to produce an inventory"); *Opperman*, 428 U.S. at 375, 96 S.Ct. at 3100 (emphasizing standardized procedures as means of limiting scope of inventory search to extent necessary to perform "caretaking function"); *Wanless*, 882 F.2d at 1463 (same); *United States v. Parr*, 716 F.2d 796, 810–17 (11th Cir.1983) (emphasizing necessity of delimiting searcher's discretion during inventory search). On the other hand, a legitimate non-pretextual inventory search is not made unlawful simply because the investigating officer remains vigilant for evidence during his inventory search. *United States v. Orozco*, 715 F.2d 158, 161 (5th Cir.1983).

 In this case, Agent Simpkins inspected Kluver's notebook by flipping through the pages for items of value. He determined it was a diary of some sort, but did *not* determine that it had evidentiary value. *Subsequently*, he further examined the notebook and decided that it did have evidentiary value. Simpkins' initial inspection of the notebook was necessary and proper to ensure that there was nothing of value hidden between the pages of the notebook. Having satisfied himself that the notebook contained no discrete items of value and having decided that the diary entries themselves would have intrinsic value to Kluver, Simpkins had satisfied the requisites of the inventory search and had no purpose other than investigation in further inspecting the notebook.[7] Such a warrantless investigatory search may not be conducted under the guise of an inventory. The inventory search, when conducted according to standardized routine in furtherance of the legitimate goals of the inventory, is an exception to the warrant requirement. *Opperman*, 428 U.S. at 369 n. 5, 96 S.Ct. at 3097 n. 5; *Lafayette*, 462 U.S. at 643, 103 S.Ct. at 2608. In the absence of a valid inventory search exception, the fourth amendment strictures and the oft-expressed preference for warrants remain undiminished. Having conducted the inventory search and there being no exigent circumstances, the investigator was free to request a warrant from a magistrate if he wished to search further. Simpkins did not seek a warrant, however, but continued his search despite the absence of a valid inventory or exigent circumstances exception.

 In *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the Court declared that evidence obtained by

---

**6.** There is no requirement that an inventory search must conform to the least intrusive means available. *See Bertine*, 479 U.S. at 375, 107 S.Ct. at 743; *Lafayette*, 462 U.S. at 647–48, 103 S.Ct. at 2610; *United States v. Johnson*, 815 F.2d at 314. The inventory must not, however, depart from its underlying justification and become a pretext for investigatory rummaging.

**7.** The facts of the instant case differ from those of *United States v. Iredia*, 866 F.2d 114 (5th Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989) and *United States v. Arango–Correa*, 851 F.2d 54 (2d Cir.1988). In *Iredia*, an address book was seized from the arrestee's car. The address book, in plain view, was identified as an item of evidentiary value during the legal warrantless investigative search at the time the automobile was initially

searched. Accordingly, its seizure at the time of the inventory was proper. The fact that the police waited until the car had been impounded to seize the notebook and log it into the "evidence inventory" was not improper.

In *Arango–Correa*, the Second Circuit held that the police were permitted to open closed notebooks pursuant to an inventory search. We agree. So long as investigative officers are acting pursuant to standardized procedures and must examine closed books for hidden items, the inventory search is proper. Indeed, in the instant case, the officer's initial inventory inspection of the notebook was proper. The subsequent search, however, was no longer cloaked in the benign purpose of the inventory search, but became an investigative search of Kluver's diary.

unconstitutional means should not be suppressed "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police...." 467 U.S. at 447, 104 S.Ct. at 2511. There is no evidence in the record to suggest that the evidence contained in the notebook would have been discovered inevitably. This circuit's rule is that in order to establish inevitable discovery the prosecution must show that the police possessed and were actively pursuing the lawful avenue of discovery when the illegality occurred. *United States v. Drosten*, 819 F.2d 1067, 1070 (11th Cir.1987); *United States v. Satterfield*, 743 F.2d 827, 847 (11th Cir.1984), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985). At the time Simpkins illegally searched Kluver's notebook, the record does not indicate that the police were actively pursuing any lawful avenue to obtain the contents of the notebook, such as seeking a warrant for an investigative search.

We conclude, therefore, that the subsequent search of Kluver's diary violated his fourth amendment right. Accordingly, the district court committed constitutional error in denying Kluver's motion to suppress.

▆▆▆ A constitutional error does not necessarily result in an automatic reversal of the conviction. In *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) and *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), the Supreme Court applied the harmless error analysis to fourth amendment violations. Thus, our review is not complete until we decide whether the constitutional error was harmful. Although some constitutional rights are "so basic to a fair trial that their infraction can never be treated as harmless error," *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967), here we fol-

low the teaching of the Supreme Court that the harmless error doctrine applies to a fourth amendment violation. "The question," as the Court noted, "is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 23, 87 S.Ct. at 827 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). In other words, if the jury might have relied on the unconstitutional evidence in reaching its verdict, then the error was harmful unless the other evidence of guilt was so overwhelming that the defendant suffered no prejudice from the admitted evidence.[8] *Drosten*, 819 F.2d at 1072.

▆▆▆ In our discussion of the sufficiency of the evidence to support Kluver's conviction, see *infra* section IV.A, we hold that there was *sufficient* evidence for a reasonable juror to find beyond a reasonable doubt that Kluver had committed the offenses charged in counts one and two. Here we apply a more stringent standard against the government. In a sufficiency analysis we review the evidence to determine whether the government has satisfied the minimum required in order for a reasonable juror to find guilt beyond a reasonable doubt. In performing harmless error analysis, however, the standard cuts more sharply against the government: there must be no reasonable possibility that the unconstitutionally obtained evidence contributed to the conviction. *Chapman*, 386 U.S. at 23, 87 S.Ct. at 827.

▆▆▆ The notebook evidence was admitted and considered by the jury, and we cannot say that the unconstitutionally obtained notebook evidence might not have contributed to Kluver's conviction. Indeed, given the factual setting of this case, we find it likely that the notebook evidence was weighed by the jury and contributed to Kluver's conviction.[9]

---

8. Where the erroneously admitted evidence is solely corroborative of other evidence that overwhelmingly indicates guilt, the error is harmless. *Drosten*, 819 F.2d at 1072. Armstrong's testimony was not such overwhelming evidence of guilt that the notebook entries, which corrob-

orate Armstrong's testimony, fall within the *Drosten* exception.

9. A jury decision is opaque, and we cannot know which evidence the jury relied upon and which evidence it disregarded. Where the defendant is the victim of constitutional error, the

Entries in Kluver's diary, as the government notes in marshalling the evidence for its sufficiency argument, link Kluver to the "second" importation plan.[10] Unless we conclude that there is no "reasonable possibility that the evidence complained of might have contributed to the conviction[,]" we cannot hold a constitutional violation harmless. In this case it appears that there is a reasonable possibility that the unconstitutionally obtained evidence "might have" contributed to the conviction. Other than the diary entries, the evidence linking Kluver to the Alexis–Armstrong–Simpkins importation plan, although sufficient to find guilt beyond a reasonable doubt, is not strong, resting predominantly on the testimony of Armstrong (the former smuggler who found it in his best interests to cooperate with the government). A central element of Kluver's defense was that he had no part in the second importation plan and that he did not participate in the conspiracy alleged by the indictment; in fact, we noted in our discussion of the jury instruction on multiple conspiracies that the jury was told to acquit if it found that the conspiracy delineated by the evidence was not the conspiracy described by the indictment. But for the notebook evidence tending to establish Kluver's participation in the second importation plan, there is a reasonable possibility that the jury might have acquitted Kluver based on the theory of his defense. Thus, we cannot say that there is not a "reasonable possibility that

the evidence complained of might have contributed to the conviction." *Chapman,* 386 U.S. at 23, 87 S.Ct. at 827. The erroneous admission of unconstitutionally obtained evidence, therefore, was not harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824. Accordingly, we reverse Kluver's conviction on counts one, two, and three.[11]

■ Although we are reversing Kluver's conviction because of harmful constitutional error, nonetheless we must still rule on Kluver's sufficiency argument because if the properly admitted evidence presented by the government was insufficient to carry its burden of proof, then Kluver's retrial would be prohibited by the double jeopardy bar. *See Ohio v. Johnson,* 467 U.S. 493, 498–99, 104 S.Ct. 2536, 2540, 81 L.Ed.2d 425 (1984) (double jeopardy bars retrial after acquittal); *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (double jeopardy bars retrial after reviewing court on appeal determines evidence at trial was insufficient); *United States v. Palzer,* 745 F.2d 1350, 1352–53 n. 4 (11th Cir.1984) (where defendant raises insufficiency claim on appeal, double jeopardy concerns "compel" court to address sufficiency even though alternative grounds for decision are present); *United States v. Meneses–Davila,* 580 F.2d 888, 896 (5th Cir.1978) (court on appeal "must reach defendant's sufficiency of the evi-

---

standard we must apply is whether there is a reasonable possibility that the unconstitutional evidence might have contributed to the defendant's conviction. In this case, we cannot know which evidence the jury relied on most heavily. It is certain, however, that there is at least a reasonable possibility that the unconstitutional evidence contributed to Kluver's conviction. Accordingly, we are bound by Supreme Court precedents to hold the error harmful.

10. Indeed, at every critical juncture in its sufficiency argument in its brief, the government leans upon the diary entries to support its case: on each of the three occasions Alexis met with Armstrong or Simpkins to discuss the second importation plan, the government relies upon the diary entries. Although there was no testimony that Kluver attended the December 15, 1983 meeting between Alexis and Simpkins, the government argues that the diary entry which

demonstrated Kluver's knowledge that Alexis had a meeting "re import from Hong Kong" was proof of Kluver's participation. Similarly the government argues that the entry for March 21, 1983 was significant because it showed Kluver's knowledge of Alexis' travel plans on the day Alexis met with Armstrong. Finally the government points to the diary entry for November 26, 1982 as proof that Kluver attended the meeting with Alexis and Armstrong where Kluver allegedly discussed his methaqualone connection. The government's own argument underscores the significance of the diary and illustrates the many ways in which the jury's consideration of the diary evidence might have contributed to the jury's verdict against Kluver.

11. *See infra* section IV.D wherein Kluver's conviction on count three is reversed for insufficiency of the evidence.

dence argument, because the Government may not retry defendant if the evidence at the first trial was insufficient").

## IV. SUFFICIENCY OF THE EVIDENCE

In reviewing a challenge to the sufficiency of the evidence this court must take the evidence in the light most favorable to the government, *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974), and credibility choices and weighing of evidence must be resolved in favor of the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In short, so long as a reasonable juror could conclude that the evidence, viewed with all reasonable inferences drawn in favor of the government, established the defendant's guilt beyond a reasonable doubt, then the conviction will withstand a sufficiency challenge. It is not necessary, however, that every hypothesis of innocence be disproven as the jury "is free to choose among reasonable constructions of the evidence." *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983) (quoting *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc) (discussing history of sufficiency of the evidence standard in the Fifth Circuit), *aff'd.*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)). *See also United States v. Sawyer*, 799 F.2d 1494, 1501 (11th Cir.1986), *cert. denied*, 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987).

"[P]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'" *United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.) (quoting *Glasser*), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). In *United States v. Cruz–Valdez*, 773 F.2d 1541, 1545 (11th Cir.1985), *cert. denied*, 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986), we noted that where large quantities of drugs are present, "a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders" because of the omnipresent danger of the ubiquitous "ripoffs" in the illicit narcotics trade. 773 F.2d at 1547. *Cruz–Valdez*, heavily relied upon by the

government, is of limited application in this case, where none of the conspirators held anything of value. Moreover, this is not a case where a large quantity of drugs was present such that no person present could avoid knowing of the drugs. Nonetheless, we must examine "all of the proved circumstances, including presence, to determine whether from them a reasonable jury could infer and find beyond a reasonable doubt knowing and intentional participation." 773 F.2d at 1545. Against this legal screen, we project the appellants' arguments.

### A. *Kluver*

Kluver's defense at trial was that he only intended to assist the importation of methaqualone from China to Haiti via Canada, a transaction he believed to be legal, and that he lacked the intent to import methaqualone into the United States. He asserts that he had no part in Serge Alexis' second importation scheme, "flowered" by Bob Armstrong and Agent Simpkins after the initial Halifax shipment terminated.

Alexis referred to Kluver as his "agent" in the United States, and Alexis expressed great confidence and trust in Kluver, going so far as to tell Simpkins that Kluver could be told anything and suggesting that Kluver attend a subsequent meeting. Such evidence is irrelevant to Kluver's intent or knowledge of past events. The fact that Alexis suggested that Kluver attend a future meeting or that Kluver could be trusted not to reveal future criminal plans does not provide evidence of Kluver's previous knowledge or intent; at most, it is evidence of Kluver's possible predisposition to commit a future violation.

The government offers other evidence: Armstrong testified that Kluver, at the November 1982 Fort Lauderdale meeting, told Armstrong and Alexis that he, Kluver, had a methaqualone source in Canada. Although that statement is consistent with Kluver's defense, the fact that it supports a hypothesis consistent with innocence does not cleanse it of the unfavorable inferences

it may support when considered in the light most favorable to the government. At the same meeting, Alexis reported on Chippas' role in the organization as the person who had the market for methaqualone in Canada and the United States. No later than that, Kluver was on notice that his associates, whom he was assisting, were planning to import methaqualone into the United States.[12] Accordingly, this evidence, exclusive of the diary, while not overwhelming, was sufficient to establish the existence of criminal intent and knowledge that Kluver claims was lacking and would have enabled a jury to find him guilty beyond a reasonable doubt of conspiracy to import methaqualone and conspiracy to possess with intent to distribute.

### B. *Khoury*

 Khoury asserts that he was entitled to a judgment of acquittal on three of the five counts on which he was convicted: counts one, two, and three (conspiracy to import methaqualone, conspiracy to possess methaqualone with intent to distribute, and conspiracy to create counterfeit methaqualone tablets, respectively).[13] We find, however, that the evidence was sufficient to support a jury verdict on all the challenged counts, except count three (conspiracy to create counterfeit methaqualone tablets).

The thrust of Khoury's argument on conspiracy is that the evidence showed "mere presence" and, at most, association with criminals and perhaps knowledge of their criminal intentions. If that were all the evidence proved beyond a reasonable doubt, then under *Cruz–Valdez*, 773 F.2d at 1544, and *United States v. Diaz*, 655 F.2d 580 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982), the evidence would be legally insufficient. The evidence, however, proved more than mere presence.

Not only was Khoury present at the hotels and restaurants where the conspirators hatched their plan and made alternative arrangements when the "heat" of surveillance forced them to abandon their initial plan, but he was also present at the meetings where significant concerns of the conspiracy were addressed. For example, Candella testified that Khoury attended the June 14, 1982 meeting where Vershish informed Khoury, Ray, and Candella that "everything was going on schedule," that Vershish would leave soon for Halifax, and that the machinery was in place. Khoury was also present when the pilot problem was discussed and they considered bringing in Bob Armstrong. During that meeting, the forty-nine drums were identified as methaqualone. This is hardly the sort of conversation that an outsider would be permitted to attend. Furthermore, Khoury was permitted to hear Vershish's announcement that the Halifax importation was called off, that the drums had been tampered with and he feared that a bug had been planted. Even if the substance of

---

**12.** In July and August of 1982 an AirCanada employee, Grant, called Kluver about the transshipment in bonded storage in Halifax, and Kluver told Grant that he knew nothing about it, but would attempt to contact Alexis to solve the problem of mounting storage charges. The government argues that it is probative of guilt that although Kluver denied knowledge of the shipment when talking to Grant, Kluver knowledgeably discussed the situation when talking with conspiracy "insiders" Alexis and Armstrong. The government, however, seems to have overlooked the obvious: the conversation with Alexis and Armstrong occurred in November 1982, several months *after* Grant had told Kluver about the shipment in Halifax awaiting pickup.

**13.** Khoury did not challenge the sufficiency of the evidence to support his conviction for aiding and abetting the attempted importation of methaqualone or the Travel Act violation. Although Khoury did adopt the arguments of his co-appellants, the fact-specific nature of an insufficiency claim requires independent briefing if we are to reach the merits. Accordingly, we do not, in this case, apply West's aiding and abetting insufficiency argument to Khoury as the two performed different roles and the evidence against the two substantially differed, thus making West's argument inapplicable.

Similarly, although Chippas' motion to join in his co-appellants' arguments was granted, given the fact-specific nature of a sufficiency challenge, we do not consider sufficiency of the evidence as to Chippas except insofar as a co-appellant's sufficiency argument turns on common facts and their legal import. See *infra* section IV.D.

these discussions was not overtly illegal, those conspirators who had an unlawful objective—and there was sufficient evidence that, at the time of the pilot problem, Vershish was planning an illicit importation into the United States—would not suffer the presence of those who were not privy to the unlawful scheme.

In addition, construing the evidence in the light most favorable to the government, the fact that Khoury frisked Candella and Armstrong before the "Sambo's" meeting permits an inference that he was concerned about being audio-taped and had some consciousness of guilt. Finally, Vershish's coconspirator statement that Khoury "was going to be in charge with the chemist making the pills" is more than mere presence, and casts Khoury's association with the other conspirators in a far more illicit light.

We conclude that Khoury's convictions, on the conspiracies to import and distribute, were supported by sufficient evidence establishing more than mere presence. All appellants' claims relating to the counterfeit substance count will be discussed below.

### C. *West*

West charges that although he was present with others whom he concedes were unlawful conspirators, he had no knowledge of the conspiracy's unlawful objectives and did nothing unlawful per se. He further asserts that he lacked the criminal intent to aid and abet the enterprise. He provides a relatively innocuous reason for giving an alias when searching for a New England warehouse for the equipment: he wanted to avoid liability for the lease if the rent was not paid. He admits installing the CB radio in his car, but says that had nothing to do with the Maine importation plan, but rather was simply so he would not have to wait for phone calls. That a defendant can construct a scenario,

based on the evidence, consistent with innocence does not prove that the evidence of guilt was insufficient as the jury is free to choose among reasonable constructions of the evidence. *Vera,* 701 F.2d at 1357.

West asserts in his brief that "there was no evidence that [he] ever knew that the methaqualone existed." The record is otherwise. Candella testified that West was present at a meeting where Vershish confirmed that the machinery would be set up in Bridgeport, and Ray discussed the problems of chemically "binding" the methaqualone. That West was on notice of the methaqualone makes his assistance in scouting the Maine landing strip inculpatory. Furthermore, once the evidence shows West knew of the drug, his installation of a CB radio and police scanner permits an inference that his activity was spurred by fear of detection. We conclude that a reasonable juror, taking the evidence in the light most favorable to the government and relying on his or her prerogative to gauge the credibility of witnesses, could have found West guilty beyond a reasonable doubt on the importation and distribution conspiracy counts, aiding and abetting count, and Travel Act violations.

### D. *The Counterfeit Substance Count*

Kluver, as well as West, argues [14] that his conviction on count three, which alleged a conspiracy to "create a counterfeit substance, to wit: methaqualone tablets manufactured to resemble pharmaceutical 'quaaludes' " is unsupported by any evidence about the appearance of pharmaceutical quaaludes or the appearance of the methaqualone tablets that the conspirators planned to manufacture. The government does not contest Kluver's assertion that there is no evidence in the record as to what quaaludes look like or the appearance of methaqualone tablets that could have been produced by the machinery in the

---

**14.** Khoury joins in this argument by virtue of Fed.R.App.P. 28(i). This court granted Chippas' motion for leave to adopt arguments of co-appellants. As this sufficiency argument turns on facts common to all appellants and the legal

import of those facts, we consider this claim as to every appellant who either raised the argument or opted into co-appellants' arguments. *See supra* note 12.

warehouse.[15] Under 21 U.S.C. § 802, a counterfeit substance is defined as

> a controlled substance which, or the container or labeling of which, without authority, bears the trademark, trade name, or other identifying mark, imprint, number, or device, or any likeness thereof, of a manufacturer, distributor, or dispenser other than the person or persons who in fact manufactured, distributed, or dispensed such substance and which thereby falsely purports or is represented to be the product of, or to have been distributed by, such other manufacturer, distributor, or dispenser.

At a minimum, to prove a conspiracy to violate section 841(a)(2), which incorporates the definition given above, the government must provide some evidence that the conspirators planned to place on the substance or its container a trademark, trade name, or other identifying mark of a manufacturer other than the persons actually manufacturing the substance.

The government has failed in its brief to direct the attention of the court to any evidence that supports the convictions on creation of a counterfeit substance, nor has our review of the record revealed such evidence. Given the total failure of proof on this count, we reverse the convictions of Khoury, Kluver, West, and Chippas on count three. As the sentence for each defendant on count three was to run concurrently with the sentence imposed on count one, we need not remand for resentencing.

## V. HEARSAY OBJECTION

*Coconspirator Statement Under 801(d)(2)(E)*

Kluver [16] complains that statements admitted against him under the rubric of the coconspirator "exception" should have been barred as the statements were not made during the course and in furtherance of a conspiracy to which he was a party. Kluver asserts that he was not a member of the second importation conspiracy "flowered" by Armstrong. Kluver also claims that several conversations were admitted which were not in furtherance of any criminal conspiracy as the discussion concerned only legitimate business dealings.

Our consideration of this claim is brief. The factual finding of the district court, based upon substantial evidence, that a conspiracy existed, that the defendant and declarant were both members of the conspiracy, and that the statement was made during the course of and in furtherance of the conspiracy, will not be overturned unless clearly erroneous. *United States v. Alvarez*, 755 F.2d 830, 855 (11th Cir.), *cert. denied*, 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985) *and cert. denied*, 482 U.S. 908, 107 S.Ct. 2489, 96 L.Ed.2d 380 (1987). In effect, Kluver's hearsay argument is an extension of his variance position and is governed largely by our disposition of that issue. Because there was evidence from which the trial judge could find that there was one conspiracy of which Kluver was a member, there was no error in admitting the evidence pursuant to Fed.R.Evid. 801(d)(2)(E) so long as the statement was made during the course and in furtherance of the conspiracy.

## VI. SEVERANCE

The claim by Khoury and Kluver that each was entitled to a severance need not long detain us. The granting of a severance is committed to the sound discretion of the trial court, and the defendant seeking severance bears a "heavy burden in demonstrating clear and compelling prejudice...." *United States v. Kabbaby*, 672 F.2d 857, 861 (11th Cir.1982); *see also United States v. Watkins*, 811 F.2d 1408, 1410 (11th Cir.) (per curiam), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 381 (1987). If the jury is able to dissect the evidence, apply the relevant evidence to the

---

**15.** One government witness testified that Canadian pharmaceutical "methaqualone tablets" came in two forms: 125 and 250 milligrams. There was no testimony about markings or identification on the tablets.

**16.** We consider this argument as to Khoury under Fed.R.App.P. 28(i).

pertinent defendant, and render a fair and impartial verdict as to each individual defendant, then there is no compelling prejudice.

The jury was instructed to consider each count and each defendant separately, and, in fact, Kluver and West each were acquitted on one count, suggesting that the jury sifted the evidence and made individual determinations of guilt and innocence. The conclusory allegations of prejudicial spillover made by appellants do not persuade us that the district court abused its discretion or that appellants suffered compelling prejudice.

## VII. CANDELLA'S COMPETENCE

Candella had a history of mental treatment, and Chippas filed a pre-trial motion to subject Candella to a psychiatric examination in order to determine Candella's competence to give evidence. Chippas also requested a hearing on the documentary evidence concerning Candella's mental health. All defendants joined in the motion, which was denied without prejudice to renew when Candella was called. Candella led off the government's evidence, but no defendant renewed the motion or objected to Candella's competency.

A defendant must object at trial to preserve an objection on appeal; the overruling of a motion in limine does not suffice. *United States v. Rutkowski*, 814 F.2d 594, 598 (11th Cir.1987). As noted in *Collins v. Wayne Corp.*, 621 F.2d 777, 784 (5th Cir.1980), motions in limine may be made to address hypothetical concerns that may not arise during the course of trial. Accordingly, where many motions are filed, the parties must reraise objections with particularity when the issue becomes ripe. We conclude that Khoury did not preserve his objection, and accordingly unless we find plain error, Khoury will not obtain relief.

Whether or not to order a psychiatric examination is committed to the broad discretion of the trial court, and the issue of a witness' competency is one particularly well-suited to consideration by the jury. Furthermore, the Federal Rules of Evidence provide an initial presumption of competence. *United States v. McRary*, 616 F.2d 181, 183, n. 1 (5th Cir.1980); *United States v. Roach*, 590 F.2d 181, 185 (5th Cir.1979). In this case, the witness was responsive to questions and answered coherently. There is no allegation that he did not understand the importance of his oath. Furthermore, the witness was extensively cross-examined on his mental health history, and defense counsel argued the witness' lack of credibility in closing.[17] There was no abuse of discretion in this case.

## VIII. ALEXIS' INVOCATION OF THE FIFTH AMENDMENT

Following an in camera conference with the trial judge, Serge Alexis invoked his fifth amendment right not to incriminate himself. Khoury and Kluver now complain that the trial judge committed reversible error because permitting Alexis' invocation of the fifth amendment prevented the defendants from "proving their lack of criminal intent ... and prevented formation of a complete record on appeal for review by this Court into the activities of government agencies which may have stopped Alexis from testifying." Alexis' refusal to testify would have affected the defendants only if they had sought the benefit of Alexis' testimony. The record is clear, however, that neither Khoury nor Kluver sought to compel his testimony.

Kluver asserts that Alexis' testimony would have revealed government activity which prevented Alexis from testifying. Kluver points to *United States v. McClure*, 546 F.2d 670, 672–73 (5th Cir.1977), but *McClure* has no applicability here, where the alleged "coercion" occurred after the witness was in custody. In *McClure* the

17. Given the wide latitude granted defense counsel in cross-examination of Candella's mental history, Khoury's reliance on *United States v. Lindstrom,* 698 F.2d 1154 (11th Cir.1983) is unpersuasive. *Lindstrom* involved the undue restriction of cross-examination to "two or three properly framed questions ... [,]" whereas in this case the court permitted wide-ranging cross-examination.

court stated that evidence that one defendant threatened and coerced another to commit an act may negate the other's criminal intent in committing the act. We fail to see how the government's alleged coercion of Alexis' invocation of the fifth amendment at trial could affect Kluver's criminal intent during the course of the pre-trial conspiracy.

Although we are aware of no on-point cases in this circuit, we find *United States v. Pardo*, 636 F.2d 535 (D.C. Cir.1980) persuasive authority for the proposition that a defendant may not complain for the first time on appeal of a witness' invocation of the fifth amendment when the defendant did not call the witness or move to compel the witness' testimony at trial. In the instant case, where neither Khoury nor Kluver called Alexis or sought to compel his testimony, they may not complain on appeal of the benefit they might have derived from Alexis' testimony had they called him.

## IX. WEST'S INEFFECTIVE ASSISTANCE CLAIM

■ West claims he was denied his sixth amendment right to the effective assistance of counsel because his lawyer had a conflict of interest as he simultaneously represented both West and Alexis. West alleges this conflict was not merely a formalism, but an actual conflict that prejudiced his defense. West's lawyer, Lipman, had to choose whether to serve the best interests of West or of Alexis in deciding whether Alexis should take the fifth and whether West should call Alexis and attempt to compel his testimony.

Lipman was appointed to represent West, and Alexis subsequently retained Lipman, who agreed to the representation despite the fact that West and Alexis were co-indictees. Alexis entered a plea of guilty before trial, and on the advice of Lipman provided Chippas with a *Byrd v. Wainwright*[18] affidavit stating that Alexis was willing to testify on behalf of Chippas

at a separate proceeding. Alexis entered his plea pursuant to an agreement with the government under which the government agreed to recommend immediate parole and deportation to Haiti; the government further agreed not to compel Alexis to testify.

West alleges that at trial, when Alexis arrived in court pursuant to Chippas' subpoena, Ms. Snow, the AUSA, protested to Lipman that Alexis' testimony was "not in the deal." Subsequently, Alexis and Lipman conferred with Judge Zloch in camera, and Alexis elected not to testify in reliance on his fifth amendment privilege. While Alexis and Lipman were in chambers, West passed a note to Judge Zloch's law clerk. Judge Zloch directed that the note be returned to West unread. The note is not in the record, but West alleges that he wrote the judge that he was concerned about his representation.

The following, however, is on the record: Lipman informed Judge Zloch that West was "concerned about any possible conflict of interest." Judge Zloch asked West, "Are you satisfied, at least up to this point, Mr. West? I mean your lawyer doesn't need any conflict of interest headaches?" West replied, "I don't either. I don't know what all this is about since Mr. Lipman does represent Mr. Alexis and myself as to whether Mr. Alexis' testimony would hurt me in any way. I don't know either."

At that point the court knew that Lipman represented both West and Alexis and that West did not want a potential conflict of interest "headache."

We are concerned that the record discloses no hearing in satisfaction of the requirement of Rule 44 which provides that the district court "shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation."[19] *United States v. Garcia*, 517 F.2d 272 (5th Cir.1975) instructs trial courts on

---

**18.** 428 F.2d 1017 (5th Cir.1970).

**19.** The government asserted on information and belief that Judge Roetger (who had the case initially before it was transferred to Judge

Zloch) had inquired of West about the conflict of interest in satisfaction of Rule 44(c); no such proceeding appears in the record, as the government conceded at oral argument.

the approach to take in assuring the protection of the sixth amendment: before permitting a defendant to waive the right to conflict-free counsel, the court must

> address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the district court as to the nature and consequences of his legal representation. Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections.

517 F.2d at 278. *See also United States v. Mers*, 701 F.2d 1321, 1325 (11th Cir.) (applying *Garcia* to Rule 44(c)), *cert. denied*, 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983).

 Absent such a waiver of the sixth amendment right, a defendant is entitled to representation free of actual conflict. A speculative or hypothetical conflict, however, does not violate the Constitution. *Lightbourne v. Dugger*, 829 F.2d 1012, 1023 (11th Cir.1987), *cert. denied*, —— U.S. ——, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). To establish the "predicate" for a constitutional violation a defendant must be able to show that his lawyer "actively represented conflicting interests...." *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980); *Lightbourne*, 829 F.2d at 1023; *Oliver v. Wainwright*, 782 F.2d 1521, 1524 (11th Cir.), *cert. denied*, 479 U.S. 914, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986). Not only must a defendant demonstrate actual conflict, but he must also show that the actual conflict "had an adverse effect upon his lawyer's representation." *Lightbourne*, 829 F.2d at 1023; *see Stevenson v. Newsome*, 774 F.2d 1558, 1562 (11th Cir.1985), *cert. denied*, 475 U.S. 1089, 106 S.Ct. 1476, 89 L.Ed.2d 731 (1986); *but cf. Baty v. Balkcom*, 661 F.2d 391, 396–97 (1981) (de-

fendant need not show adverse effect upon representation *if* defendant demonstrates actual conflict), *cert. denied*, 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982). Once the defendant shows both actual conflict and adverse effect, "prejudice is presumed and the defendant is entitled to relief." *Lightbourne*, 829 F.2d at 1023 (citations omitted); *Turnquest v. Wainwright*, 651 F.2d 331, 333–34 (5th Cir.1981); *but cf. Baty v. Balkcom*, 661 F.2d at 395 ("Once we have found an actual conflict of interest, however, we have, without further inquiry, presumed prejudice to the defendant.").

 Although the cases tend to interchange "actual conflict" and "adverse effect," under either rubric, precedent requires a defendant to point to "specific instances in the record to suggest an actual conflict or impairment of their interest." *Mers*, 701 F.2d at 1328 (quoting *United States v. Fox*, 613 F.2d 99, 102 (5th Cir. 1980)). Furthermore, a defendant must show that his lawyer made a choice between plausible courses of action, such as presenting arguments or evidence helpful to one client but harmful to the other. *Mers*, 701 F.2d at 1328; *Barham v. United States*, 724 F.2d 1529, 1532 (11th Cir.), *cert. denied*, 467 U.S. 1230, 104 S.Ct. 2687, 81 L.Ed.2d 882 (1984); *Oliver*, 782 F.2d at 1524; *Baty v. Balkcom*, 661 F.2d at 395 (actual conflict).

In this case there was simultaneous representation of two defendants; we do not believe, under the circumstances, that the fact that Alexis had pled guilty bars a conflict as West alleges that Alexis was still beholden to the government for its sentencing recommendation. According to West's allegations, Alexis had exculpatory evidence that he refused to give based upon advice from Lipman. The government responds, however, that the conflict, at most, was speculative because Alexis, in fact, could not provide West with exculpatory evidence as Alexis was involved in a separate part of the conspiracy. Furthermore, the government argues that the testimony that Alexis allegedly could have given—that West was told that the machin-

ery was for novelty toys (which was the predominant theory of West's defense)—was corroborated by Vershish's testimony.

We believe, however, that Alexis' corroboration of West's theory could have been significant, especially in light of the fact that Vershish was a codefendant on trial with West, whereas Alexis had not been sitting before the jury throughout the trial and could have been perceived as a more credible witness with less incentive to lie as he was no longer in apparent jeopardy. We further note that Alexis need not have met West during the course of the conspiracy to provide exculpatory testimony. If it were part of the conspiracy to deceive the underlings of the purpose of the activity, such testimony would have been highly relevant to West's defense.

■ We are unable, however, to rule effectively on the ineffective assistance claim raised by West because factual development is lacking as the claim was not heard initially by the district court. A major difficulty with reviewing claims of ineffective assistance on direct appeal is that the lawyer in question did not make a record on the issue of effective assistance. As a result, it is not surprising that a claim of ineffective assistance of counsel may not be raised on direct appeal where the claim has not been heard by the district court nor a factual record developed. *United States v. Edmondson*, 818 F.2d 768, 769 (11th Cir. 1987) (per curiam); *United States v. Rodriguez*, 582 F.2d 1015, 1016 (5th Cir.1978) (per curiam); *United States v. Gray*, 464 F.2d 632, 634 n. 1 (8th Cir.1972); *United States v. Prince*, 456 F.2d 1070, 1070–71 (5th Cir.1972); *but cf. United States v. Taylor*, 648 F.2d 565, 573 (9th Cir.) (nonjurisdictional rule of forbearance with extraordinary circumstances exception), *cert. denied*, 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981). Accordingly, we dismiss this claim without prejudice to West's remedy under 28 U.S.C. § 2255.[20]

## X. DEA–6 BRADY MATERIAL

■ The government's star coconspirator witness, sharing the marquee with Candella, was the unindicted pilot, Bob Armstrong. He testified that the Cessna Titan aircraft with tail number N6765D crashed and burned with a load of cocaine on board in Colombia in October 1982. This was one of several transactions involved in Armstrong's plea agreement with the government. After trial a DEA–6, which is an investigatory report made by the DEA, surfaced during discovery in another case. The DEA–6, dated December 17, 1982, reported that Armstrong had refueled Titan N6765D near Albany, New York in Novem-

**20.** The court has taken notice of the fact, appearing on the docket sheet and contained in the record on appeal, that West filed a § 2255 motion alleging ineffective assistance of counsel. Neither the appellant nor the government drew our attention to this fact. Nonetheless, in the interest of judicial economy and the avoidance of piecemeal litigation we note that where a prisoner raises in a § 2255 motion a claim that is then pending on direct appeal, the § 2255 motion is "not entitled to consideration on the merits." *Jones v. United States*, 453 F.2d 351, 352 (5th Cir.1972) (per curiam). In *Jones* the district court initially denied the prisoner's motion on the merits, but subsequently modified its order so that the motion was dismissed without prejudice for lack of ripeness. Similarly, in *Welsh v. United States*, 404 F.2d 333 (5th Cir. 1968), the court noted "[a] motion to vacate sentence under 28 U.S.C. § 2255 will not be entertained during the pendency of a direct appeal, inasmuch as the disposition of the appeal may render the motion moot." 404 F.2d at 333.

The new Fifth Circuit in *United States v. Ortega* asserted that the principle underlying *Welsh*, "that a notice of appeal automatically divests the trial court of jurisdiction" was "explicitly rejected" in *United States v. Hitchmon*, 602 F.2d 689 (5th Cir.1979) (en banc) and *United States v. Dunbar*, 611 F.2d 985, 987 (5th Cir.) (en banc), *cert. denied*, 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980). *United States v. Ortega*, 859 F.2d 327, 334 (5th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 1157, 103 L.Ed.2d 216 (1989). We note, however, that neither *Dunbar* nor *Hitchmon* involved an appeal of a § 2255 motion: *Dunbar* held that a frivolous interlocutory notice of appeal did not deprive the district court of jurisdiction to try the case while *Hitchmon* stood for the proposition that the filing of a notice of appeal from a non-appealable order does not divest the district court of jurisdiction. Lest we be misunderstood, we emphasize that our citation to *Welsh* should not be construed to cast doubt on the en banc decisions in *Hitchmon* and *Dunbar*. To the contrary, the solicitude for judicial efficiency demonstrated in *Dunbar, Hitchmon*, and *Ortega* support our decision here, which is intended to avoid needless and repetitive litigation.

ber 1982. The DEA–6 is printed on an official government form, signed by two special agents, contains confidential informant code numbers, and describes with specificity the agents' investigation at the Albany airport. Appellants argue that this evidence was exculpatory because it could have been used to impeach Armstrong's testimony that the plane crashed and burned in October of 1982, while he escaped without harm. This DEA–6 was not released to the defendants pursuant to their *Brady* [21] request, and the defendants moved for a new trial based on the government's failure to release the DEA–6.

The government, at an ex parte in camera hearing held after the motion for new trial was filed, informed the district court that the DEA–6 was completely fictitious, signed by non-existent DEA special agents, chronicling a conversation that never occurred with a confidential informant who was invented by the DEA. The purpose of this elaborate ruse was to create seemingly exculpatory material, plant it in the law enforcement computer network, and thus track down unauthorized access to the computer by someone associated with a defendant in the case. At the in camera hearing, Agent Simpkins informed the court that, based on hearsay, he believed that another agent, Coleman Ramsey, had conducted the sting operation and had caused the fictitious DEA–6 to be created. Simpkins does not give the exact date the fictitious report was created, but the AUSA stated that the document was created after the trial was concluded.

Assuming that the statements made by the AUSA and Simpkins at the in camera ex parte hearing were true, then no *Brady* violation occurred as there was no document in existence which could have been released. We need not reach the question

whether the very existence of a fictitious DEA–6 could be *Brady* material insofar as it casts doubt on the veracity of other DEA evidence. We are concerned that the procedure followed here did not provide sufficient guarantees of reliability. In this case, no *evidence* was presented at the the in camera hearing: neither Agent Simpkins nor AUSA Seltzer was sworn. [22] Furthermore, virtually all of the statements provided to the court were rank hearsay, with no foundation of personal knowledge. Indeed, according to Agent Simpkins' volunteered statement, if the DEA–6 were correct, it could be construed as inculpatory as to Agent Simpkins.

We are also concerned by the potential that false documents have to wreak havoc should they go astray. Documents may be long-lived, and where they carry indicia of accuracy and reliability on their face, during the course of a long investigation they could become intermingled with legitimate documents. The widespread use of photocopying makes that possibility even more likely. *Cf. State v. Cayward*, 552 So.2d 971 (Fla.Dist.Ct.App.1989) (hazards of false documents used for interrogation). Nonetheless, we recognize that such falsifications, in certain circumstances, may be a necessary investigative method, and an ex parte hearing may be the only means by which the government can avoid disclosing its investigation. When the government resorts to falsified investigative reports which contain apparent *Brady* material, the government runs the risk that its proffer at the in camera ex parte hearing will not be deemed of sufficient reliability on appellate review. This is such a case.

We are loathe to rely on statements made ex parte and in camera by persons not sworn as witnesses based on hearsay regarding a matter that could be inculpato-

---

**21.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *see also United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

**22.** Agent Simpkins was placed in a difficult position where he had to avoid an appearance of impropriety. In explaining the fictitious DEA–6, he volunteered that were the DEA–6 in fact accurate it would support the defendants' theory that he, Simpkins, had conspired with Armstrong. He noted that an allegation

> would be that Armstrong and I were the guys that took the 340 kilos and disposed of it. The other thrust of the matter is that the crash never occurred, that Armstrong did, in fact, import the cocaine and I guess split it up with me or something.

ry to the person providing the statement. In order to review the appellants' claims we require a more reliable record. Although we understand the district court's denial of the defendants' motion for a new trial to constitute an implicit factual finding that the DEA–6 was fictitious, nonetheless we must conclude that the finding is not entitled to any deference as it is supported only by unsworn statements which are not reliable evidence. Accordingly, we remand to the district court for a hearing to determine whether the DEA–6 constitutes *Brady* material.

## XI. SPEEDY TRIAL ACT

West and Chippas complain that their statutory right to a speedy trial was violated, and they both moved to dismiss the indictment on that ground prior to trial.

The Speedy Trial Act ("the Act") requires that trial commence within seventy days of the filing of the defendant's indictment, or his first appearance before a judicial officer in the district where the charges are pending. 18 U.S.C. § 3161(c)(1). The Act also provides that certain periods of delay are excludable from the seventy days, thus tolling the ticking of the speedy trial "clock."

West and Chippas were both indicted March 14, 1984, but Chippas did not appear before a judicial officer in the Southern District of Florida, where the charges against him were pending, until his arraignment on April 20, 1984; West was arraigned on April 18, 1984. Trial did not commence until December 23, 1985. Unless significant periods of delay were excludable, West and Chippas were denied their right to a speedy trial under the Act.

The Act excludes from the speedy trial clock "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion...." 18 U.S.C. § 3161(h)(1)(F). In addition "[a] reasonable period of delay" may be excluded "when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(7). Furthermore, when the clock stops for one defendant, generally it stops for all defendants. *United States v. Darby*, 744 F.2d 1508, 1517 n. 2 (11th Cir.1984), *cert. denied*, 471 U.S. 1100, 105 S.Ct. 2322–23, 85 L.Ed.2d 841 (1985); *United States v. Stafford*, 697 F.2d 1368, 1372 (11th Cir. 1983).

■■■ On April 30, 1984 Khoury moved for a *James* [23] hearing, and the government suggests that the clock was stopped until trial when the hearing was finally held. The government is wrong. Khoury's *James* motion was referred to a magistrate who denied the motion, without prejudice, in reliance on *United States v. Lippner*, 676 F.2d 456 (11th Cir.1982), on May 17, 1984.[24] In *Lippner* this court noted that although it may be preferable to hold a *James* hearing before trial, it is not necessary. Under *James* it is the government that bears the burden of establishing the existence of the conspiracy to overcome the hearsay bar which operates at trial through timely defense objection.

■■■ The *James* hearing was held after opening statements were made by the government and defendants. Obviously then, there was no "delay *resulting from*" the motion when the motion was not decided until *after* trial commenced. The defendants attempted to obtain a pre-trial ruling, but the court, through the magistrate, denied the motion without prejudice. There was, thus, no motion pending from which delay could have resulted.[25] Accordingly,

---

**23.** *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

**24.** The magistrate denied the motion, rather than deferring the motion to the trial court to be ruled upon. *Cf. United States v. Garcia*, 778 F.2d 1558, 1560 (11th Cir.) (deferral of *James* motion to district court is not a denial), *cert.*

*denied*, 477 U.S. 906, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986).

**25.** This conclusion is consistent with *Henderson v. United States*, 476 U.S. 321, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986) and *Stafford*, 697 F.2d 1368. In *Stafford* the court ruled that where a motion requiring a hearing is pending, the time is automatically excluded even though the delay in

**972**

time between the filing of the motion and the disposition by the magistrate is excludable, but the time between May 17, 1984 and trial is not excludable. We conclude, therefore, that the government's reliance on subsection (h)(1)(F) is misplaced as to Khoury's *James* motion because there was no motion pending.

The government also argues that the period from the time Chippas filed, on May 16, 1984, a motion for an audibility hearing until trial, when the hearing was conducted, is excludable. We disagree. The hearing was delayed until after the start of trial. In fact, the audio tape evidence was not introduced at trial until January 3, 1986. Although the government alleges that the audibility motion was "resolved," the citation to the record proffered by the government reveals absolutely no ruling on Chippas' audibility and transcript verification motion. Furthermore, our independent search of the record reveals no such ruling. Therefore, it appears that no audibility hearing was ever held, the court apparently believing that the audibility of the tape would speak for itself at trial. Where trial not only began but ended without a ruling on the motion for a hearing, it is self-evident that no delay resulted from the

motion, and accordingly no time was excludable as a result.

■ We turn next to the government's contention that section 3161(h)(7) tolled the time. Under subsection (h)(7), the clock stops during a "reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." In the instant case a co-indictee was a fugitive from justice. There is a strong preference for trying codefendants together as it promotes judicial efficiency by avoiding successive trials involving the same evidence. *United States v. Tobin*, 840 F.2d 867 (11th Cir. 1988) held that the reasonable delay attributable to the fugitive status of a co-indictee is excludable as to those defendants awaiting trial,[26] and the *Tobin* court, emphasizing the fact that there was no motion for severance, found that under the facts of that case an eight month and ten day delay was reasonable, both under the "totality of the circumstances" approach and the "actual prejudice" standard. 840 F.2d at 870 (citing *Darby*, 744 F.2d 1508). Expressly reserved in *Tobin*, however, was the issue of "how much time must pass before the court should grant a severance, upon mo-

starting the trial is not the result of the requested hearing. The court was concerned that a contrary construction "would present extremely difficult practical questions of whether a particular motion did or did not actually delay the commencement of a trial." 697 F.2d at 1371. In the instant case, there is no such factual difficulty. Where there is no motion pending there can be no *resultant* delay, regardless of how delay or causation may be defined.

In *Henderson*, the Court held that subsection (F) excluded "all time between filing of a motion and the conclusion of the hearing on that motion, whether or not a delay in holding that hearing is 'reasonably necessary.'" 476 U.S. at 331, 106 S.Ct. at 1877. There is nothing in the opinion to suggest, however, that in the absence of any causation whatsoever, where the hearing is not required to be held nor is in fact held before trial, the time is excludable. In *Henderson* the trial court needed further information from the parties before the court could rule on a pre-trial suppression motion. Under *Henderson*, a hearing on a motion could be unreasonably delayed until the day before trial commenced, the entire period would be excluded, and there would be no violation of the Act.

Where the hearing on the motion need not be and is not decided before trial, however, logically there can have been no delay caused by "awaiting" the hearing on the motion as the trial began without the hearing. This is consistent with *United States v. Mastrangelo*, 733 F.2d 793 (11th Cir.1984), where a suppression hearing was held before trial, and the entire time, not limited to that "reasonably necessary," was excluded from filing of the motion through conclusion of the hearing. We are aware of no case where a motion filed pre-trial excludes all time through the hearing where the hearing is never held or is held *after* the commencement of trial.

When a motion is pending and no hearing is held on the motion until after the trial has commenced, there can be no "resulting" delay under § 3161(h)(1)(F) as the trial has started without the hearing; the commencement of trial and the hearing are independent events. The instant *James* motion time exclusion, however, does not turn on that distinction as here there was simply no motion pending.

26. *See also United States v. Pena*, 793 F.2d 486 (2d Cir.1986) (excluding 25 days because of co-defendant fugitive).

tion of a defendant, so as to afford such defendant the benefit of the Speedy Trial Act." *Id.* at 870 n. 4. Both West and Chippas moved for severance from the fugitive Williams on Speedy Trial grounds, Chippas on August 1, 1984, and West on February 4, 1985.[27] According to the docket sheet, West's motion for severance was never ruled upon, but effectively a severance was granted when trial began in the absence of the fugitive codefendant. The government maintains that the entire period of delay was reasonable. On the record before us we are loathe to agree. Confronting the open question of *Tobin,* we hold that the length of delay such as that here is not reasonable where the defendant has made a motion to sever a fugitive codefendant in the absence of a showing by the government that it is actively continu-

ing to pursue the fugitive and believes in good faith that the fugitive will be brought to justice promptly. There is not a hint in the record that the government as of July 1985 was relying on the codefendant's fugitive status as the reason for delaying the trial. Indeed, the reasons given by the government in its continuance motion were that the trial would overrun the end of the district court's trial session and that it would be a hardship on the government to bring witnesses from Canada more than once.

The district court judge handling the pretrial administration of the case ceased, on July 1, 1985, to rely upon the fugitive status of the codefendant as a reason for excludable delay. The court granted the *government's* motion for a continuance in reliance on 18 U.S.C. § 3161(h)(8)(A),[28] rul-

27. The government disingenuously asserts in its brief that Chippas never filed a motion for severance. While technically true that no motion was *filed,* Chippas orally moved for severance at a pre-trial conference. Fed.R.Crim.P. 12(b) permits severance motions to be oral or written, in the discretion of the judge. When the district court stated, "Speedy Trial never starts to run until they are all apprehended, so I trust there is no reason why this matter should be set for trial," Chippas' counsel responded that his client was ready to go to trial according to the calendar call. The court rebuffed counsel, stating, "I'm not trying him twice. I've got fugitives, I don't try them any more ... absent some compelling reason." Chippas' counsel then moved for a severance to which the court responded, "The old saying I always heard was people in hell want ice water, too." In the context of the colloquy we are confident that everyone present understood the court to have denied the motion.

28. Section 3161(h)(8) provides that the following period of delay shall be excluded:

(8)(A) Any period of delay resulting from a *continuance granted by any judge on his own* motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

(B) The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:

(i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.

(ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

(iii) Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex.

(iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

(C) No continuance under subparagraph (A) of this paragraph shall be granted because

ing that the interests of justice outweighed the best interests of the public and the defendant in a speedy trial. Significantly, the government does not rely on that order to support its argument, despite the fact that the order provided that "[t]he period of delay resulting from this continuance shall be excludable time." The government's decision not to emphasize the continuance order was wise.

■■■ The order granted the *government's* motion, although the only reason the court gave—and subsection (h)(8)(A) requires the court to give reasons if the time is to be excludable—was that the court understood that counsel for defendants would be unavailable. The record reveals, however, that only the *government* said that defense counsel would not be available, despite the fact that the defendants had not moved for a continuance, had pressed their speedy trial rights, and in fact, even according to the government, had requested that the trial be placed first on the trial calendar. The minutes of the calendar call reflect that the case was set for July 1. Moreover, the order's declaration that Vershish's lawyer would not be available for one week did not provide sufficient justification, in weighing the ends of justice against the interest in speedy trial, to continue the case for eighteen months and exclude all that time. At longest, based on the record, the reasons given justified a continuance through August 1.

■■■ There is, however, a conjunction of time exclusions under sections 3161(h)(1)(F) and (h)(7) such that the Act was not violated. We agree with the government's contention that the period of delay between arraignment on April 18 and 20, 1984 (in the case of West and Chippas respectively) and October 17, 1984 was reasonable under subsection (h)(7) because one of the co-indictees was at large. Thus we conclude that despite Chippas' request for severance on August 1, 1984, the delay through October 17, 1984 was reasonable on the facts of this case. On October 17, Kluver filed a motion to suppress evidence, and the pre-

trial hearing on the motion was not held until December 23, 1985. Whether or not the delay was reasonable, the time is automatically excluded until a hearing is concluded on those motions which require a hearing. *Henderson v. United States*, 476 U.S. at 329–30, 106 S.Ct. at 1876; *Stafford*, 697 F.2d at 1370–71.

We conclude, therefore, that under sections 3161(h)(1)(F) and (h)(7) the entire period from April 18, 1984 until trial was excludable, and hence the statutory speedy trial right was not violated.

## XII. SENTENCING: SPECIAL PAROLE PROVISIONS

West, Khoury, and Chippas each were ordered to serve a special parole term as a result of their conviction of aiding and abetting the attempted importation of methaqualone in violation of 21 U.S.C. § 963. *Bifulco v. United States*, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980), however, as the government points out, interprets identical statutory language to bar the imposition of a special parole term for attempt or conspiracy. We remand to the district court for consideration in light of *Bifulco*.

## CONCLUSION

The appellants' convictions on count four for creating a counterfeit pharmaceutical substance are REVERSED for insufficiency of the evidence. Appellant Kluver's convictions on counts one, two, and three are REVERSED because unconstitutionally seized evidence was erroneously admitted against him. Appellant West's ineffective assistance of counsel claim is DISMISSED WITHOUT PREJUDICE to his pursuing collateral relief. Finally, we REMAND to the district court on the *Brady* issue and for proceedings consistent with this opinion and *Bifulco*. In all other respects, the judgment below is AFFIRMED.

of general congestion of the court's calendar, or lack of diligent preparation or failure to

obtain available witnesses on the part of the attorney for the Government.