[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-12589
Non-Argument Calendar
_____

D.C. Docket No. 8:11-cr-00438-RAL-MAP-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOHN JOSEPH STEELE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(March 19, 2013)

Before CARNES, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Defendant John Steele appeals his conviction for attempting to persuade or

entice a minor to engage in a sexual act, in violation of 18 U.S.C. § 2422(b).  He

argues that the district court erred in denying his motion to suppress physical evidence—condoms and personal lubricant—found in a closed, opaque bag during an inventory search of his car that followed his arrest.  After review, we affirm.

## I.  BACKGROUND

### A.    Steele's Offense Conduct

In June 2011, law enforcement agencies in Lake County, Florida, conducted an undercover operation in which officers posed on the Internet as individuals who had children available for sexual encounters.  During the evening of June 18, 2011, Orlando Police Detective Loriana Fiorino posted an ad, entitled "Beautiful Niece and Fun Times," on the website Craigslist.  The ad was listed in the Hillsborough County "casual encounters" section.  The ad stated the poster was located in Clermont, Florida, and inquired "Want to have fun with my beautiful and energetic niece?  Let me know."

Roughly 90 minutes after Detective Fiorino posted the ad online, Steele responded with two e-mails asking the ad's poster to contact him.  Steele's second e-mail provided his telephone number.  Using the name "Lisa Calderone," Detective Fiorino called Steele about 40 minutes after she received his second e-mail.  Steele stated he was in Wesley Chapel, Florida, which he estimated was a 45 to 60-minute drive away from Clermont, Florida.  During their conversation, Detective Fiorino informed Steele multiple times that her niece was 13 years old.

2

Steele stated the niece's age was "kind of a problem" and expressed concern that he was being set up by a police officer.  When Detective Fiorino responded "obviously this isn't something that you're interested in," Steele asked her not to hang up the phone and stated he "didn't say [he] wasn't interested."  Detective Fiorino then offered to send Steele photos of her and her niece "Summer."

Steele informed Detective Fiorino he would like "normal sex," but he was willing to reach whatever limits Detective Fiorino or her niece set.  To alleviate Detective Fiorino's stated concerns about her niece possibly becoming pregnant, Steele stated he would bring protection, was disease-free, and could "always pull it out."  Steele explicitly declined to talk to the niece on the phone.  After this phone call, Detective Fiorino sent Steele an e-mail with an address, a photograph of her, and a photograph of "Summer," which was an actual photograph of another female officer at age 13.

On a second phone call, Steele stated he had received Detective Fiorino's e-mail and he found the pictures to be "very nice."  Steele also told Detective Fiorino he would arrive at her house to meet "Summer" in "45 minutes to an hour" and he would be driving a "green Chevy Tahoe."  During a third phone call, Detective Fiorino asked Steele "did you bring any condoms with you just in case?," to which Steele replied "yes" before further indicating he was unsure whether a 13-year-old would like condoms.

3

Shortly after the third phone call, Steele called Detective Fiorino at 11:47 p.m. to figure out which house was hers. As part of the undercover operation, law enforcement maintained an actual house to which subjects were directed and intercepted by police. Detective Fiorino reiterated the address and described the house.

When Steele arrived, law enforcement officers approached him and arrested him once he entered the house. The officers patted him down and removed his wallet, in which they found a condom and Steele's driver's license.

After Steele's arrest, Lake County Deputy Sheriff Richard Winn processed Steele's car and inventoried its contents before it was towed. In a white plastic bag at the base of the driver's seat, Deputy Winn found a tube of personal lubricant and a box of condoms. A crime scene technician photographed and documented all items collected from Steele and from his car, including the plastic bag, the lubricant, the box of condoms, and the condom found in Steele's wallet. Another officer drove Steele's car from the sting house to another location for towing.

Steele was arrested and advised of his Miranda rights. After Steele waived his rights, Detective Rick Salcedo, also with the Orlando Police Department, interviewed Steele. Steele told Detective Salcedo that (1) he had come to meet "Lisa" and her 13-year-old niece; (2) "Lisa" had offered her niece for sexual

activities; and (3) he had come to the sting house to save the niece "from being molested."

## B.    Steele's Motion to Suppress

A federal grand jury indicted Steele on one count of knowingly attempting to persuade or entice a minor to engage in a sexual act, in violation of 18 U.S.C. § 2422(b).

Prior to the beginning of trial on February 13, 2012, Steele alerted the district court that (1) he had not received the government's trial exhibit list, which included photos of the condoms box and lubricant tube, until February 4 or 6; and (2) the government did not indicate the condoms and lubricant were found in Steele's car until February 11 or 12.[1]  The district court permitted Steele to move orally to suppress the items seized from his car, as well as photos of them, and held a suppression hearing following jury selection.

At the suppression hearing, Deputy Winn testified.  On the night of Steele's arrest, Deputy Winn served as a scribe, notating when Steele arrived and who interviewed him.  Steele's car, like all those arriving during the undercover operation, was inventoried to catalog items of value and thus avoid anything turning up missing.  Within a two-hour time frame, at least four suspects arrived at

---

[1]Steele asserted he failed to file a motion to suppress because he was unaware any evidence was recovered from his car.  The government countered that the initial discovery list, dated September 15, 2011, did include the condoms and lubricant, but admitted the initial list did not say specifically where the items originated.

the sting house and were arrested.  All of the arrestees' cars were inventoried by police and later towed away.  The police recovered evidence in every car—there were always condoms, and occasionally some candy the suspect brought for the minor.

Because of the nature of the sting operation and its associated time constraints, it was standard operating procedure for the police to quickly move the suspects' vehicles into the sting house's garage, inventory them, and then remove them to a "holding location" to await a tow.

Deputy Winn further testified that he was sure there were written procedures for inventory searches but that, while familiar with those procedures generally, he was "[p]robably not verbatim" familiar with them.  Deputy Winn began the search of Steele's car by taking the car's keys from Steele.  As Deputy Winn entered and drove Steele's car into the garage for further processing, he did not see any evidence in plain view.  At some point during the inventory search, Deputy Winn saw a closed, white plastic bag at the edge of the driver's seat.  Deputy Winn admitted opening the closed bag.  Deputy Winn may have kicked the bag open as he was getting in and out of the car, but stated that once he saw it, he "would have opened it up just to see what it was."  Deputy Winn was "not a hundred percent positive" as to whether his department had a written policy about how to treat closed packages discovered during inventory searches.  The completed vehicle

6

impoundment and inventory sheet indicates that Deputy Winn located condoms, a personal lubricant, a GPS, and sunglasses in Steele's car.

Crime scene investigator Erica Stamborski, also with the Lake County Sheriff's Office, testified.  During the undercover operation, Stamborski documented arriving cars and collected any items of evidentiary value.  To her knowledge, Steele's car was not treated differently than any other vehicle. Stamborski photographed Steele's plastic bag first where it was found on the driver's side floorboard, and again after it was opened by Deputy Winn.

The district court concluded there was no question that standard operating procedure for the undercover operation included moving cars into the garage, inventorying them, and impounding them as quickly as possible.  The district court determined that this procedure and the search of Steele's car were reasonable under the "unique fact pattern" of this undercover operation and thus denied Steele's motion to suppress evidence of the condoms and lubricant found in his car.  The government then introduced them, as well as the photos, at trial.

After trial, the jury found Steele guilty of attempting to persuade or entice a minor to engage in a sexual act.  The district court sentenced Steele to a 120-month term of imprisonment.  Steele timely appealed.

## II.  STANDARD OF REVIEW

Because a district court's denial of a motion to suppress presents a mixed question of law and fact, we ordinarily review the district court's legal rulings <u>de novo</u> and its findings of fact for clear error.  <u>United States v. Lindsey</u>, 482 F.3d 1285, 1290 (11th Cir. 2007).[2]  In so doing, we view the facts "in the light most favorable to the prevailing party in [the] district court," <u>id.</u>, and we defer to the district court's credibility determinations, unless they appear "unbelievable." <u>United States v. Ramirez-Chilel</u>, 289 F.3d 744, 749 (11th Cir. 2002).

## III. DISCUSION

Before addressing the search issue, we first note that there was clearly probable cause for Steele's arrest.

## A.     Probable Cause

"Probable cause to arrest exists when the facts and circumstances within the collective knowledge of law enforcement officers, or of which they have reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense."  <u>Craig v. Singletary</u>, 127 F.3d 1030, 1042 (11th Cir. 1997) (en banc); <u>see</u> <u>United States v. Lanzon</u>, 639 F.3d 1293, 1300 (11th Cir. 2011) (concluding probable cause supported a warrantless

---

[2]We decline the government's invitation to review the district court's ruling on Steele's motion to suppress under a plain error standard of review.  Steele both raised and adequately preserved in the district court the arguments he now makes on appeal.

search of a car where the driver (1) engaged in online communication with a minor; (2) agreed to bring condoms and meet the minor for sex; (3) drove to the meeting place; and (4) was arrested by police upon his arrival).

Here, Steele several times corresponded with Detective Fiorino about having sex with her 13-year-old niece advertised on Craigslist, and then Steele drove a significant distance, making the nearly hour-long drive from Wesley Chapel to Clermont to meet Detective Fiorino's niece. These circumstances, and in particular Steele's stating he would like "normal sex" with "Summer" and he would bring protection to avoid getting "Summer" pregnant, established probable cause to arrest Steele for attempting to persuade or entice a minor to engage in sexual activity.

Further, Steele's argument on appeal is not that his arrest was unlawful, or that once he was arrested and his car was impounded the police were not permitted to conduct an inventory search of his car. Steele's argument instead goes to the reasonableness of the scope of the inventory search performed. Specifically, Steele contends that the police officers impermissibly opened the closed bag containing the condoms and lubricant and thus those items must be suppressed.

B.    **Inventory Searches and Closed Containers**

The Supreme Court has explained that police officers may open closed containers during warrantless inventory searches of vehicles or other property

9

lawfully in police custody, provided that the opening is conducted according to "standardized criteria" or "established routine." [3] Florida v. Wells, 495 U.S. 1, 4, 110 S. Ct. 1632, 1635 (1990); see Colorado v. Bertine, 479 U.S. 367, 369-70, 376, 107 S. Ct. 738, 740, 743 (1987) (upholding a search through a backpack encountered during an inventory search, but noting this was explicitly allowed by police department's inventory procedures).  "[T]he reasonableness of the inventory search depends on the particular facts and circumstances" of each case.  United States v. Laing, 708 F.2d 1568, 1571 (11th Cir. 1983).

Here, it is questionable whether the government sufficiently showed any departmental policy or established routine as to closed containers.  Although Deputy Winn affirmatively testified there were written policies for inventory searches, he was "not a hundred percent positive" they specifically addressed closed containers.  While there was also an established search routine for this unique undercover operation, that routine did not necessarily include opening all closed containers in the cars quickly processed.  Ultimately, we do not need to

---

[3]The Supreme Court has stated:

A police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself. Thus, while policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors.

Florida v. Wells, 495 U.S. 1, 4, 110 S. Ct. 1632, 1635 (1990).  "The policy or practice governing inventory searches should be designed to produce an inventory."  Id.

resolve this close question because any error in admitting the items from Steele's car was harmless, as explained below.

## C.    Harmless Error

Fourth Amendment violations are evaluated in light of the harmless error doctrine, which asks "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Chapman v. California, 386 U.S. 18, 23, 87 S. Ct. 824, 827 (1967) (internal quotation marks omitted). "[I]f the jury might have relied on the unconstitutional evidence in reaching its verdict, the error was harmful unless the other evidence of guilt was so overwhelming that the defendant suffered no prejudice from the admitted evidence." United States v. Khoury, 901 F.2d 948, 960 (11th Cir. 1990). There must be "no reasonable possibility that the unconstitutionally obtained evidence contributed to the conviction." Id.

Even disregarding the condoms and lubricant seized from Steele's car, overwhelming evidence links Steele to the single crime for which the jury found him guilty. Cf. id. at 961 (concluding that other than an illegally seized diary, the evidence showing a defendant's knowing participation in a conspiracy was "not strong"). Here, the jury considered evidence of Steele's e-mails to Detective Fiorino, the transcripts of the four phone calls between them, Detective Fiorino's testimony, Steele's own testimony, the condom found in Steele's wallet, and

11

Steele's act of traveling almost an hour from Wesley Chapel to Clermont to meet the 13-year-old niece. In fact, the condoms from Steele's car are hardly prejudicial when the government properly admitted the condom found on Steele's person as he approached the house to meet the 13-year-old niece.

Additionally, at trial, Steele testified and essentially admitted the government's version of events. His only defense was that his motivation was that he "wanted to help that child" and "talk [Detective Fiorino] out of doing what she was doing." In light of the overwhelming direct evidence tying Steele to the crime, the jury was not required to credit Steele's testimony about his motivation and instead could have viewed his motivation claim "as substantive evidence of [his] guilt." United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) (holding that "when a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true" (internal quotation marks omitted)). In sum, any error by the district court in admitting the box of condoms and personal lubricant found in Steele's car was harmless. See Khoury, 901 F.2d at 960.

## III. CONCLUSION

In light of the foregoing, and after our careful review of the briefs and the record in this case, we find no reversible error and affirm Steele's conviction.

**AFFIRMED.**

12